IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMSC-010

Filing Date:   March 5, 2009

Docket No. 30,722

STATE OF NEW MEXICO ex rel.
GARY K. KING, ATTORNEY GENERAL
and NEW MEXICO STATE GAME COMMISSION
OF THE STATE OF NEW MEXICO,

        Plaintiffs-Petitioners,

v.

UU BAR RANCH LIMITED PARTNERSHIP,
a Nevada Limited Partnership, et al.,

        Defendants-Respondents.


ORIGINAL PROCEEDING ON CERTIORARI
Peggy J. Nelson, District Judge

Gary K. King, Attorney General
David K. Thomson, Assistant Attorney General
Nanette E. Erdman, Assistant Attorney General
Santa Fe, NM

for Petitioners

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Henry M. Bohnoff
Edward Ricco
Jocelyn C. Drennan
Albuquerque, NM

for Respondents

OPINION


1

**BOSSON, Justice.**

**{1}** The State Attorney General filed this quiet-title action to secure title to a roadway that historically had provided public access to thousands of acres of state trust lands in Colfax and Mora counties. The Attorney General has prevailed in its quest to quiet title, with two Court of Appeals opinions agreeing that the state holds title to the road in question. This appeal arises because the second Court of Appeals opinion, while not disturbing the first Court of Appeals' conclusion as to title, conclusively decided that the road did not provide access to state trust lands—an issue which had never been fully litigated, much less decided by any of the prior courts. In so holding, the second Court of Appeals opinion established the location of the border between state and private lands in a different place from its commonly, and historically, accepted site—doing so, importantly, even though the titleholder of those state lands was never joined in any prior proceedings.

**{2}** Relying in part on our law-of-the-case doctrine, we reverse the second Court of Appeals opinion, and decide that the state has title to a road that provides public access to state trust lands unless, and until, there is a proper adjudication of that boundary line with all necessary parties joined. We affirm the part of the second Court of Appeals opinion that declares the width of said road.

**BACKGROUND**

**{3}** Late in the summer of 1997, a private company which owned thousands of acres of ranch land and wilderness in northern New Mexico built a locked gate across what for at least 150 years had been a public thoroughfare, and what for many decades had been a principal means of public access to 41,000 acres of nearby state trust land. Angered by the company's blockade of this public resource, local residents complained to public officials. The Attorney General investigated and discovered that state officials had told the company, UU Bar Ranch ("the Ranch"), that the state had abandoned its interest in the road. Relying on this advice, the Ranch had blocked public passage across the road.

**{4}** Seeking to guarantee public access to adjacent state trust lands, the Attorney General filed suit in 1998, requesting injunctive relief. It asked the district court of Colfax County for an order requiring the Ranch to remove the gate and allow access. The district court dismissed the suit, but suggested that the Attorney General re-file the action as a quiet-title action. The Attorney General did so.

**{5}** This decision, to proceed in the form of a quiet-title action, transformed the case from what may have been a relatively straightforward effort to re-establish the public's right to use a New Mexico state highway into a more complicated proceeding. The new quiet-title action had as its ultimate goal the provision of public access to state trust lands—the same goal as the original injunctive action. But that goal had to be achieved in a more roundabout way by establishing that the state held title to the road.

2

**{6}** The State has successfully proven title. The Court of Appeals, in two separate opinions, has agreed that the state and not the Ranch holds title. However, the amorphous nature of a quiet-title action permitted litigation on questions which strayed far from the lawsuit's original purpose. The litigation drifted into areas that had little to do with the purpose, foundation, and central issue of this lawsuit, which has always been a simple question: May the public use the public road in question to get to publicly owned lands?

**{7}** For reasons that follow, we answer this question in the affirmative. In doing so, we acknowledge that the location of the boundary between the Ranch and state trust lands could, in later litigation before a different court, affect the more basic question of whether the road enters public lands. But this litigation has not yet happened, and the case before us was never, and still is not, a boundary dispute.

**{8}** The district court entered numerous findings of fact and conclusions of law, largely uncontested, which form the backdrop to this litigation. The section of road in dispute ("the Road") is a 2.6-mile stretch of dirt road in Colfax County which was once part of El Camino Real and the Mountain Branch of the Santa Fe Trail. The Road has been the property of New Mexico since statehood, and prior to that was the property of the Territory of New Mexico. The Road passes through private property owned at the time of this litigation by the Ranch. The Ranch property abuts vast public lands, formerly part of the Maxwell Land Grant, that are held in public trust by the state. Historically, the public has used those state trust lands for hunting and recreational activities. Of special importance to this opinion, the public has long gained access to those public lands from the north and east by traveling along the Road, and did so continuously over many years until the events leading to this litigation.

**Procedural History**

**{9}** The procedural history of this appeal is unusually complex. That complexity has become an important part of the case in its own right and has had a significant impact both on the arguments of the parties and on the result we reach in this opinion. Accordingly, we consider it helpful to devote more attention than usual to the incremental actions of the courts that have preceded this appeal.

**{10}** The first district court to hear this case entered a decision (District Court I) in 2002 which included findings of fact and conclusions of law, many of which we have already summarized above. Of particular import to this case is the court's finding that the Road is "wholly within" Ranch property. The Ranch hangs much of its argument on this phrase, asserting that it shows a clear factual finding by District Court I that the Road does not reach state trust lands. We address this argument in detail below. Notwithstanding the State's historical claim to title, District Court I found that the State had abandoned its title to the Road by virtue of official actions taken in 1985. Continuing to press for public access to the state lands adjacent to the Road, the State appealed the court's finding that it had abandoned the Road.

3

**{11}** In a published opinion, the first Court of Appeals (Court of Appeals I) reversed, holding that the State had *not* abandoned title to the Road. *State ex rel. Madrid v. UU Bar Ranch Ltd. P'ship*, 2005-NMCA-079, ¶ 2, 137 N.M. 719, 114 P.3d 399. In doing so, the Court of Appeals emphasized the Road's significance to the public, twice reiterating that the Road provided access to state trust lands. The Court noted that "the Road is critical to access to state trust lands," *id. ¶* 17, and described the court's task as determining "who is the rightful titleholder to a road that provides access to the White Peak area of state trust lands," *id.* ¶ 2. Court of Appeals I perpetuated the "wholly within" language used by District Court I, changing it slightly to "completely within." *Id.* ¶ 3.

**{12}** Court of Appeals I remanded to the district court for further proceedings consistent with its opinion. *Id.* ¶ 34. This Court denied the Ranch's petition for certiorari, 2005-NMCERT-6, and the issue of abandonment is not before us. What is before us is how the State, having prevailed on the only issue decided by the appellate court, did not thereafter secure the one thing it had sought from the very beginning—public access along the Road to the state lands beyond.

**{13}** The answer can be found in the district court's order on remand (District Court II), as well as the second Court of Appeals opinion (Court of Appeals II). Those two courts, in concert, culminated in a result which might be described as producing a road to nowhere: the courts collectively held that the State has title to the Road, but that Road does not do the one thing for which the State wanted it—provide access to state trust lands.

**{14}** Arguing that District Court II violated the spirit of the Court of Appeals I opinion by failing to grant title to a road providing access, the State appealed. It asked the Court of Appeals to adopt a definition of the Road which, the State asserted, affirmatively provided access to state trust lands.

**{15}** Court of Appeals II declined to do so, but rather affirmed the District Court II in an unpublished memorandum opinion. *State ex rel. King v. UU Bar Ltd. P'ship*, No. 26,194, slip op. at 5 (N.M. Ct. App. Oct. 5, 2007). It was in this opinion that the Court struck out into virgin territory, expressly concluding for the first time in this litigation that the Road did *not* provide access to state trust lands. *Id.* at 6. Based on its own reading of the evidentiary record, Court of Appeals II concluded that the Road actually provided no access to anyone to the adjacent state lands except presumably those traveling with the permission of the Ranch. *See id.*

**{16}** The Court of Appeals II opinion, relying on its understanding of District Court II, held that the Road actually terminated short of the state trust land boundary and "inside [the Ranch's] property." *Id.* at 3. Rejecting the State's view of what had transpired up to that time, the court summarized its position: "Although Plaintiffs won this battle by establishing title to a 2.6 mile stretch of road of the former Santa Fe Trail, they have yet to win the war, since the 2.6 mile stretch of road to which Plaintiffs have successfully quieted title terminates inside Defendant's property." *Id.* at 5.

4

**{17}** Faced with the prospect of having snatched defeat from the jaws of victory, the State petitioned this Court for review. We paraphrase the State's position as follows. After years of litigation, the State has finally won title to a Road which, until the Ranch placed its gate in 1997, had always provided access to adjacent state trust lands, but which now, according to the Court of Appeals, terminates inside the Ranch boundaries and, in effect, leads nowhere.

**{18}** We granted the State's petition to resolve the important question of access to public lands as well as the uncertain implications of the lower court rulings with regard to the location of the boundary line between the Ranch and state trust lands. We are also concerned about the troubling implications of having expended more than a decade of our judiciary's time and resources without, we are told, even approaching resolution of this conflict.

## DISCUSSION

**{19}** The State argues that the Court of Appeals II holding departs inexplicably and unjustifiably from what had already become the established law of this case. That law of the case is contained in the prior judicial rulings referred to above, and most particularly in Court of Appeals I, which appeared to assume that the Road provided public access to the state trust lands in question. In response, the Ranch argues that the law-of-the-case doctrine does not apply, and that we should affirm Court of Appeals II, because it is supported by substantial evidence in the record. To decide this question, we turn first to an analysis of the relevant evidence in light of our law-of-the-case doctrine, and then to the Court of Appeals II opinion which is at the heart of the State's appeal.

### Law of the Case

#### *Standard of Review*

**{20}** Whether law of the case applies, as well as how it applies, are questions of law subject to de novo review. *See Cordova v. Larsen*, 2004-NMCA-087, ¶ 10, 136 N.M. 87, 94 P.3d 830.

#### *Case Law*

**{21}** We have long held that a decision by an appeals court on an issue of law made in one stage of a lawsuit becomes binding on subsequent trial courts as well as subsequent appeals courts during the course of that litigation. *See Ute Park Summer Homes Ass'n v. Maxwell Land Grant Co.*, 83 N.M. 558, 560, 494 P.2d 971, 973 (1972) ("The doctrine of law of the case has long been recognized in New Mexico, since before statehood . . . ."); *Varney v. Taylor*, 79 N.M. 652, 654, 448 P.2d 164, 166 (1968) (same). The law of the case generally applies to questions of law, not "purely fact" questions. *Gruschus v. C.R. David Constr. Co.*, 77 N.M. 614, 618, 426 P.2d 589, 592 (1967). Further, this Court is not a fact-finding body. *See id.*; *Jontz v. Alderete*, 64 N.M. 163, 167, 326 P.2d 95, 98 (1958). We have more

5

recently noted that the law-of-the-case doctrine is "discretionary and flexible," *Trujillo v. City of Albuquerque*, 1998-NMSC-31, ¶ 31, 125 N.M. 721, 965 P.2d 305, and is not a doctrine "of inflexible law," *Reese v. State*, 106 N.M. 505, 506, 745 P.2d 1153, 1154 (1987) (quoting 5 Am. Jur. 2d Appeal and Error § 750 at 194 (1962)).

**{22}** In this case, the Court of Appeals I opinion, having reversed the District Court I decision, constituted the law of this case. *See Van Orman v. Nelson*, 80 N.M. 119, 120, 452 P.2d 188, 189 (1969). Its mandate was binding on the district court as well as on the second appeals court. That opinion was to be referred to if there was any doubt or ambiguity regarding the mandate. *See State ex rel. Del Curto v. Dist. Ct. of Fourth Jud. Dist.*, 51 N.M. 297, 304, 183 P.2d 607, 611 (1947). The Court of Appeals I opinion and mandate set forth the full extent of the jurisdiction of the district court on remand. *Varney*, 79 N.M. at 655, 448 P.2d at 167. The district court was not free to enlarge or alter the issues presented in the mandate. *See Fortuna Corp. v. Sierra Blanca Sales Co.*, 89 N.M. 187, 189, 548 P.2d 865, 867 (1976). The mandate binds the district court and subsequent appeals courts—in this case, Court of Appeals II—which are bound by the law of the case established by the earlier appeals court, in this case Court of Appeals I. *See Ute Park Summer Homes Ass'n*, 83 N.M. at 560, 494 P.2d at 933. It is not merely the mandate, but the entire opinion of the Court of Appeals which constitutes the law of the case. *Hughes v. Hughes*, 101 N.M. 74, 75, 678 P.2d 702, 703 (1984). If there is any doubt or ambiguity regarding the mandate, the *meaning* of the Court of Appeals opinion governs. *Id.* In fact, the opinion itself so predominates that even the mandate must give way to the opinion as to the law of the case, if there is any conflict between them. *Del Curto*, 51 N.M. at 305, 183 P.2d at 612.

**{23}** The Ranch argues that District Court I's description of the Road property and its location constitute a pure question of fact, and therefore are immune from a law-of-the-case challenge.[1] This contention fails for two reasons. First, the Ranch has focused its analysis in the wrong place. It is not the district court's conclusions we analyze to determine whether the issue was one of law or fact, as the Ranch argues. Rather, it is the appellate court's conclusions in Court of Appeals I. *See Ute Park Summer Homes Ass'n*, 83 N.M. at 560, 494 P.2d at 973 ("If an *appellate court* has considered and passed upon a question of law and remanded the case for further proceedings, the legal question so resolved will not be

---

[1]In its brief to this Court, the Ranch cites to the District Court I decision's description of the Road which falls under the heading "Findings of Fact," apparently to support the notion that the description of the Road property is a factual, and not a legal, question. What the Ranch does not cite, however, is the District Court I decision's later description of the Road which falls under the heading "Conclusions of Law." Ironically, it is *this* description of the Road, contained in the "legal conclusions," which most aids the Ranch's overall case, because it is this later description which specifies that the Road, "including its junction with the Heck Canyon trail," is located "entirely within the external boundaries" of the Ranch. The first description states merely that the Road is "wholly within" the boundaries of the Ranch. The relevance of that distinction will be made clear later in this Opinion.

determined in a different manner on a subsequent appeal." (Emphasis added.)).

**{24}** The second reason the Ranch's argument fails is that the determination of the Road's title is not a "purely fact" question. *Gruschus*, 77 N.M. at 618, 426 P.2d at 592. Whether a particular issue is a question of fact or law is itself a legal issue upon which we are free to make our own determination. *Edens v. N.M. Health & Soc. Servs. Dep't*, 89 N.M. 60, 62, 547 P.2d 65, 67 (1976). We are not bound by the labels affixed to the issues by the courts below. *Id*.

**{25}** It is true that the conclusions of Court of Appeals I were based on specific facts, but, even where an issue is "highly dependent on . . . specific facts," it may nonetheless be a question of law, not fact. *Gates v. N.M. Taxation & Revenue Dep't*, 2008-NMCA-023, ¶ 18, 143 N.M. 446, 176 P.3d 1178 (filed 2007). In *Gruschus*, on which the Ranch heavily relies, we made a very limited exception to the law of the case for a "purely fact" question—in that instance, the amount of sand and gravel used in the construction of a highway—that bears no resemblance to the title and access issues before us. 77 N.M. at 618, 426 P.2d at 592.

**{26}** Other states have concluded in actions similar to the one before us now that decisions about quiet-title actions are conclusions of law. *See, e.g.*, *Kimberlin v. Roberts*, 107 S.W.2d 24, 28 (Mo. 1937) (ownership in equitable count of quiet-title action is question of law); *Gill v. Gerrato*, 904 A.2d 576, 579 (N.H. 2006) ("The interpretation of a deeded right of way is ultimately a question of law. . . ." (citation omitted)); *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996) (in eminent domain action, whether access rights to property have been materially and substantially impaired is a question of law).

**{27}** In concluding that the State held title to the Road, and in observing that the Road "provides access to the White Peak area of state trust lands," *State ex rel. Madrid*, 2005-NMCA-079, ¶ 2, Court of Appeals I was making a statement regarding an issue of law, not fact. Recognizing that there are certainly factual elements to the determination of the Road's title, we nonetheless conclude based on our case law supplemented by the case law of our sister states that it is a legal conclusion, and therefore subject to our law-of-the-case doctrine. Keeping in mind that under *Trujillo*, 1998-NMSC-031, the law-of-the-case doctrine leaves considerable discretion to appellate courts to interpret what, precisely, the law of the case is, we turn now to the evidence to interpret it in light of law-of-the-case principles.



**{28}**     As can be seen from the above map, near the Road's southern terminus it joins up with the jeep trail known as the Heck Canyon Trail, a narrow and switch-backing dirt road which branches off to the west into the White Peak recreational area. Historically, local residents have traveled the 2.6-mile section of the Road, then the Heck Canyon Trail, and arrived at the White Peak area.

**{29}**     There is no dispute at this late stage in the proceedings that the State holds title to the 2.6-mile section of the Road.  It is not clear, however, who holds title to the Heck Canyon Trail, over which one travels to reach the White Peak area.  The courts below did not decide this question, and neither do we.  Before the advent of this litigation, the question would have been irrelevant to the issue of access to state trust lands.  Of the many maps in the record, every map created before this lawsuit began shows the junction of the Road and the Heck Canyon Trail as located *on* state trust land.  In other words, as long as the state held title to the 2.6-mile stretch of the Road, the public could travel the Road to its junction with the Heck Canyon Trail, and then turn into state land and proceed along the Heck Canyon Trail to the White Peak area.

**{30}**     But if the boundary between the Ranch and state trust lands were somehow placed in dispute and shifted by dint of judicial decision to the southwest from where it was long assumed to be (and from where it has long appeared on state maps), the junction with the Heck Canyon Trail would then be on Ranch land, not state land.  In that case, the Road would no longer provide access to state trust land, even if the State held title to the Road. The Ranch could then erect a gate at or near the Road's junction with the Heck Canyon Trail and public access to state lands would terminate. The Ranch argues this very position to this Court, rooting its argument in the Court of Appeals II opinion.  According to the Ranch's view, public access becomes a function of where the boundary line is situated between the State and the Ranch.

### *The Boundary Dispute*

**{31}**     The Ranch's argument that the Heck Canyon Trail junction is on Ranch property depends on the testimony of Bill Harris, a surveyor hired as the Ranch's expert witness.  In an evidentiary hearing that preceded the decision in District Court I, Harris testified that the actual location on the ground of the boundary between the Ranch and state trust lands is *not* where decades of state highway map makers, community members, area property owners, and various state agencies apparently thought it was.  Rather, Mr. Harris testified that the boundary is situated some 700 feet southwest of where it appears on official state maps.

**{32}**     If it is true, as Harris testified and the Ranch argues, that the boundary has shifted,[2]

_____

[2]The Ranch argues that Mr. Harris found the actual boundary, and therefore does not refer to his proposed boundary as a "shift," but rather as the true boundary. We refer to it as a "shift" because it is clear in the record that Mr. Harris's position contradicts the long

two critical conclusions would follow. One is that the Road would likely fail to provide access to state trust lands, assuming that the State does not hold title to the Heck Canyon Trail. The other conclusion, entirely overlooked by the lower courts, is that the Ranch would hold title to the acreage in between the old and new locations of the boundary, which up to now had always been in the hands of the State, or which, at the least, had long been assumed to be in State possession. Even more significant to our analysis, the State would have lost title to this acreage without the Commissioner of Public Lands, other potential boundarymen, or other interested parties ever having been joined in this litigation.

{33}    For reasons that are not clear from the record, the State did not mount a vigorous challenge to the Harris testimony, either at trial or on appeal, though we note that the State did submit ample evidence at trial which contradicts Mr. Harris's testimony. For example, official state highway maps from 1942, 1949, 1958, and 1975, all show the Road actually crossing the boundary between the Ranch and state trust lands *before* splitting off on the Heck Canyon Trail. All of these maps show the junction with the Heck Canyon Trail situated on state land. An official state land status map from 1971 also shows the Road clearly crossing the boundary line in question. Most recently, a detailed map produced in 1999 by the GIS Bureau of the State Land Office shows clearly that the junction with the Heck Canyon Trail is on State trust land, not on Ranch property.

{34}    In its pleading before the trial court, the Ranch raised a Florida case, *Gilman Paper Co. v. Newman*, 398 So. 2d 887, 888 (Fla. Dist. Ct. App. 1981), and a Texas case, *Waldrop v. Manning*, 507 S.W.2d 626, 631 (Tex. Civ. App. 1973), in support of the proposition that the State's maps are "of insufficient scale to locate the boundary," and that they "lack the evidentiary foundation that would be the predicate to their use as evidence of the surveyed boundary." Although we note that there is also contrary authority, *see, e.g.*, *Mosher v. Commonwealth*, 494 A.2d 56, 58 (Pa. Commw. Ct. 1985), we take no position on whether the highway maps or state planning maps are adequate to make a final determination as to the boundary line. We merely note that had the boundary issue been fully litigated, the district court would have made specific conclusions about where the property boundary lies. It did not.

{35}    Though the Harris testimony, if believed, might lend substantial evidence to a judicial finding in support of the Ranch's position, the course of this appeal is not so straightforward. We emphasize that the first two courts to hear this case—District Court I and Court of Appeals I—never expressly adopted the Harris testimony. Moreover, neither of these first two courts came to the conclusion that the boundary between the Ranch and the State was actually situated in a different place from where maps showed it be. In fact, these two courts, which fashioned the law of this case, made *no* mention of Harris or his testimony.

---

presumption of state officials in several different agencies, as well as the practice of local persons on the ground.

**{36}**     The Ranch appears to argue that by describing the Road as being "wholly within" Ranch property, the District Court I decision necessarily adopted and endorsed the Harris testimony. We disagree. District Court I never made any factual finding that the boundary between the Ranch and State trust lands had shifted, nor did it explicitly endorse the Harris testimony. In fact, District Court I never made any findings about the specific location of the boundary.

**{37}**     In its findings of fact and conclusions of law, the District Court I decision was at best ambiguous, and at worst outright self-contradictory as to whether the Road provides access to trust land by crossing the boundary between the Ranch and state land. The decision notes numerous times that the Road provides access, noting for example the State's purpose in seeking title "in order to use the Road as access to the Heck Canyon Trail, and State trust land for hunters." Later, the court noted that until the Ranch's blockade, the Road was "used continuously by hunters . . . to gain access to Heck Canyon and state trust lands." These assertions suggest the court recognized that the section of road in dispute crossed into state trust lands.

**{38}**     It is true that there are also descriptions that suggest, but do not unequivocally assert, that the Road does *not* cross into state trust land. Chief among these are the two words that undergird the Ranch's argument: "wholly within." The court early in its decision described the Road as being "wholly within the exterior boundaries of the UU Bar ranch."

**{39}**     Later in its discussion, District Court I modified the "wholly within" language to say "entirely within," also adding to it in the following way:   "The Road, *including its junction with the Heck Canyon Trail* is located entirely within the external boundaries of the UU Bar Ranch." (Emphasis added.) By appearing to assert that the Heck Canyon Trail junction was on Ranch property, this language offers more support than the mere words "wholly within" for the Ranch's contention that the property boundary had shifted.

**{40}**     However, as we have noted, this conclusion would conflict with the court's earlier assertions that the Road provides access, and further is a major alteration from the "wholly within" language. At the very least, the court's apparent conclusions about the boundary line are inconsistent and self-contradictory. While we generally engage in a presumption of correctness, *see Farmers, Inc. v. Dal Mach. & Fabricating, Inc.*, 111 N.M. 6, 8, 800 P.2d 1063, 1065 (1990), and we are deferential to facts found by the trial court, *see Strata Prod. Co. v. Mercury Explor. Co.*, 121 N.M. 622, 627, 916 P.2d 822, 827 (1996), we cannot defer to findings when we cannot determine what they were. And while we will presume that trial courts do not make inconsistent findings, *see Sanchez v. Saylor*, 2000-NMCA-099, ¶ 23, 129 N.M. 742, 13 P.3d 960, where findings are plainly inconsistent, we are unable to arbitrarily choose one of those inconsistent conclusions.

**{41}**     We also note in passing that there is more than one credible reading of the words "wholly within" in this context. A road would be accurately described as existing "wholly within" someone's property if it went right to the border of that property and terminated

there.  The road in that case would still provide access to the neighboring property, because it would create a path right up to the border between the properties.

**{42}** Here, there is sufficient conflict and ambiguity that we cannot tell what exactly District Court I concluded, if anything, regarding the boundary between the Ranch and state trust lands.  It is not enough, given the high stakes here, to extrapolate, based on the trial court's conflicting language, that it made any factual findings about the precise location of the boundary much less findings that contradict long-lasting presumption and practice on the ground.  There is good reason why District Court I's conclusions as to the location of the boundary appear so ambiguous—the issue was not properly litigated, and therefore could not have been actually decided.

**{43}** Moreover, the District Court I decision *rejected* proposed findings of fact submitted by the Ranch that would have clearly endorsed the Harris testimony and relocated the boundary in the way the Ranch would prefer.  The proposed findings, rejected by the court, were:

> In the vicinity of the southern terminus of the Road, the Maxwell Land Grant boundary line and thus the eastern boundary of the state trust lands lies approximately 700 feet to the west of the Road, i.e., the Road's junction with the Heck Canyon Trail lies entirely on the Ranch's fee property. *At no point does the Road touch upon or cross the Maxwell Land Grant boundary.  As a result, the Road would not provide complete access to the state trust lands*; hunters and other persons using the Road would still have to cross ranch property to reach the state trust lands.

(Emphasis added.)

**{44}** Those words never appear in the District Court I decision.  When a trial court rejects proposed findings of facts or conclusions of law, we assume that said facts were not supported by sufficient evidence.  *See Landskroner v. McClure*, 107 N.M. 773, 775, 765 P.2d 189, 191 (1988); *In re Guardianship of Ashleigh R.*, 2002-NMCA-103, ¶ 18, 132 N.M. 772, 55 P.3d 984.  Accordingly, the district court rejected a description of the boundary line which is quite similar to the Court of Appeals II description, which concluded that the Road "terminates inside Defendant's property." *State ex rel. King*, No. 26,194, slip op. at 5.  The rejected findings of fact, if ever adopted by the district court, would have made this a boundary case, which it is not, and would have made clear to the State the precariousness of its focus on title to the Road when the real issue was the location of its boundary.  That description would also have made clear to Court of Appeals I that title to the Road did *not* afford public access to the Heck Canyon Trail and state trust lands which, of course, is directly contrary to the manner in which the Court of Appeals I opinion described that very Road.

12

**{45}**     We acknowledge that the Ranch raised the boundary issue early in this litigation. The Ranch argued that the State had an obligation to clearly define the property to which it sought title, including a metes and bounds description. We observe that if the Ranch wanted to reestablish the boundary location, it should have asserted in some independent action that the boundary long assumed by the public and by state map makers was incorrect. *See Velasquez v. Cox*, 50 N.M. 338, 176 P.2d 909 (1946) (citing with approval an Eighth Circuit case, *State of Iowa v. Carr*, 191 F. 257, 258 (8th Cir. 1911), for the proposition that the party challenging a long-accepted boundary bears the burden of proof). Such an action would have set in motion the joinder of interested parties. The Ranch opted instead for litigating the boundary dispute as an ancillary issue, without complicated joinder issues being addressed. There is no indication in the record that the Ranch ever filed an action to overturn the long-presumed boundary line. Although the boundary issue was raised early, until Court of Appeals II it was at most a sideshow, and a largely silent one at that, to the main stage—the quiet-title dispute.

**{46}**     Set against the considerable ambiguity of the district court's factual findings as to the location of the boundary, we have the Court of Appeals I opinion, which assumes that the road provides access to state trust lands. As we have already noted, Court of Appeals I appeared to believe it was granting title to a Road which provided access. Because Court of Appeals I was the first appellate court to pass on this case, it created the law of the case, *see Van Orman*, 80 N.M. at 120, 452 P.2d at 189. That means that later courts were bound to follow not only its mandate, but the *meaning* of the opinion. *See id.* at 119, 452 P.2d at 188; *Hughes v. Hughes*, 101 N.M. 74, 75, 678 P.2d 702, 703 (1984).

**{47}**     Instead, Court of Appeals II struck out on its own and reached contradictory conclusions. The opinion causes us grave concern for several reasons. First, the court largely based its decision on the ill-founded assumption that the district court "apparently accepted Harris's testimony as credible and persuasive." *State ex rel. King*, No. 26,194, slip op. at 3. As we have already shown, it is anything but clear that the court fully accepted the Harris testimony. But the Court of Appeals II opinion took this misstep even further, asserting that unless the Harris testimony "depends on a physical impossibility or is false," the Court was bound to accept the Ranch's argument. *Id.* This assertion might be true if it were clear the Harris testimony had been adopted, and that it constituted the basis for the lower court's conclusions. Since neither of these were true, the Court of Appeals was in no way bound by Harris's testimony.

**{48}**     In addition to the unwarranted adoption of the Harris testimony, the Court of Appeals II opinion is troubling because it raises serious unanswered legal questions. Upholding the Ranch's proposed boundary would amount to ceding significant public acreage to a private landowner by implication. At least one seemingly indispensable party, the State Land Office or the Commissioner of Public Lands, or possibly the State Game Commission, was never joined as a party to this litigation. As a matter of law, it would appear incontrovertible that the boundary line between the Ranch and the state lands could not have been reestablished without, at the very least, the presence in court of the state agencies which are

13

the trustees of those very state lands.

{49}     It is not clear in the record precisely which state agency or agencies have authority over the trust lands in question. Generally, the Commissioner of Public Lands has authority over state trust lands, *see* NMSA 1978, §§ 19-1-1 to -2 (1912, as amended through 1989). However, there are indications in the record that the New Mexico Game Commission has held an easement in public trust for some of these lands. The State Game Commission was a party to this case from very early in the proceedings, but not in the capacity of title holder to the trust lands in question, and not for the purpose of determining a boundary. As we have already noted, because the boundary issue was insufficiently litigated, it is not clear in the record what state agencies might have a stake in the land in question. That is part of the problem. As the administrator of state trust lands, the Commissioner of Public Lands would likely have interests necessarily affected by a judicial determination to shift the state trust land boundary. We therefore note, without deciding the issue, that if the Ranch's preferred interpretation of the boundary location were given force by this Court, it would implicate our indispensable-party doctrine in a way that would likely require us to remand this litigation so that it would start over again from square one. *See, e.g.*, *Herrera v. Springer Corp.*, 85 N.M. 6, 7, 508 P.2d 1303, 1304 (Ct. App.) (holding that a court cannot proceed to judgment in the absence of an indispensable party), *rev'd in part on other grounds*, 85 N.M. 201, 510 P.2d 1072 (1973). Avoiding that drastic conclusion, and noting the uncertainty surrounding the lower courts' conclusions about the boundary's location, we instead conclude that the lower courts could not have intended to move the boundary line, not at least in the present litigation. Our conclusion that the boundary line has not shifted from its long-presumed location does not preclude further litigation as to where the boundary line actually lies. Rather, we merely conclude, on the facts before us, that the courts below could not have concluded that the boundary line shifted.

{50}     Among the other unanswered questions regarding a potential boundary dispute is whether adopting the Harris testimony would run afoul of our doctrine of boundary by acquiescence, and whether the decades of public traffic across the road would have established an easement by prescription. The easement by prescription argument was explicitly eliminated by the trial court early in the litigation, for reasons that are not entirely clear in the record. As for the doctrine of boundary by acquiescence, the facts of this case would appear to provide a classic example. Under the doctrine, propounded in detail in a case the state cited in its corrected proposed findings of fact and conclusions of law, a boundary can be established by "long recognition of abutting landowners." *Woodburn Bros. v. Grimes*, 58 N.M. 717, 275 P.2d 850 (1954). The doctrine which is independent of the doctrine of adverse possession holds that where parties agree, even implicitly upon a boundary, that boundary may be established as a matter of law even if it is not accurate according to plats, surveys or other maps. *See, e.g.*, *Sanchez v. Scott*, 85 N.M. 695, 516 P.2d 666 (1973); *Gilman v. Powers*, 83 N.M. 80, 488 P.2d 337 (1971); *McBride v. Allison*, 78 N.M. 84, 428 P.2d 623 (1967); *Thomas v. Pigman*, 77 N.M. 521, 424 P.2d 799 (1967); *Sproles v. McDonald*, 70 N.M. 168, 372 P.2d 122 (1962); *Hobson v. Miller*, 64 N.M. 215, 326 P.2d 1095 (1958); *Murray Hotel Co. v. Golding*, 54 N.M. 149, 216 P.2d 364 (1950);

14

*Velasquez*, 50 N.M. 338, 176 P.2d 909; *Rodriguez v. Ranch Co.*, 17 N.M. 246, 134 P. 228 (1912).

**{51}**     We conclude that the boundary line is not and, in fact, *could not* be where the Ranch now argues it is, at least not without further litigation with additional parties joined to ascertain the actual location of the boundary on the ground.  This may help explain why the district court never expressly established a location for that boundary line—either in accordance with the Harris testimony or as set forth historically in state maps and similar descriptions.  The court may well have recognized the numerous hurdles and pitfalls that would necessarily confront such a move, and therefore left the actual location of the boundary ambiguous.

**{52}**     Perhaps recognizing its dilemma, the Ranch at oral argument took the position that it only intended to establish the boundary "for the purposes of this litigation."  The Court asked counsel for the Ranch:  Who owns the property between the long-presumed boundary and the boundary as established by Harris?  Ranch counsel replied, "The Ranch does, for purposes of this litigation."  In the Ranch's briefing before this Court, it advanced a related argument that the boundary is not contiguous with the boundary between the Ranch and state trust lands, but "for present purposes," the land grant boundary and the boundary between Ranch and the trust lands "will be treated as the same."

**{53}**     Purely as a matter of logic and common sense, neither of these arguments can stand.  The Ranch cannot have it both ways.  Either it argues that the boundary has shifted away from its long presumed location in accordance with the Harris testimony, therefore potentially setting in motion a transfer of real estate, or the boundary is where it has always been assumed to be.  Boundaries do not shift "for the purposes of" litigation, then shift back again when the litigation is done.

**{54}**     Without the Harris testimony and a reestablished boundary location, this case reduces to what it has always been:  a complaint to establish title to a Road that has always provided access to state lands.  Put another way, until abandonment, the Road had always provided access to state trust lands.  When the Ranch won on abandonment, it could deny access.  When the Ranch lost on abandonment, then logically it would seem that the State would be returned to the status *quo ante*—the same position it held before the Ranch blocked access.  That status quo,  replete with public access to state trust lands, would prevail unless and until the Ranch were to challenge the location of that boundary in some other litigation with all necessary parties present.

**{55}**     Court of Appeals I appeared to recognize the logic of this position that, once it decided the question of abandonment, access would follow.  In the very text of its opinion, Court of Appeals I observed that the Road "provides access to the White Peak area of state trust lands."  *State ex rel. Madrid,* 2005-NMCA-079, ¶ 2.  The Ranch does not appear to have challenged this and similar language  providing access in the opinion while the Court of Appeals still had jurisdiction over the appeal, nor did it challenge the access language in

its petition for a writ of certiorari to this Court following the Court of Appeals I opinion. The Ranch's motion for rehearing before the Court of Appeals focused on the issue of abandonment, further emphasizing that this case has always been about title and access, not about the location of the boundary.

{56}     While it may be a stretch to conclude that Court of Appeals I affirmatively held that the Road provided access to state trust lands, it is nonetheless clear what Court of Appeals I did *not* hold. It did not hold that the boundary line had shifted from its long-presumed location; it did not hold that the Road did not provide access to state trust lands. The evidence in the record as to the boundary line was unchanged from Court of Appeals I to Court of Appeals II. Court of Appeals I apparently assumed that the Road provided access, while Court of Appeals II—based on the same record —decided the opposite. Court of Appeals II made explicit conclusions which contradicted Court of Appeals I and which went beyond the scope of the findings made by either District Court I or District Court II.

{57}     This resembles a kind of photo negative of the typical law-of-the-case scenario, in that it is the absence of an affirmative legal conclusion which the later court violated, rather than the presence of one. If not a clear-cut law-of-the-case issue, it offers a helpful parallel. Court of Appeals II should have been guided more by what was clearly stated in Court of Appeals I, and less by what was never clearly stated in either district court decision on the questions of boundary and access.

### Width of the Road

{58}     The State asserts, in summary fashion, that the Road should be 60 feet in width. It bases this argument on a misreading of NMSA 1978, § 67-5-2 (1903). Because that statute does not apply to the road in question, we affirm the district court's determination on remand that the Road is 24 feet wide.

{59}     The district court concluded on remand from the Court of Appeals I opinion that the Road is 24 feet wide. The Court of Appeals II court affirmed. *State ex rel. King*, No. 26,194, slip op. at 5. The State argues on appeal that because Section 67-5-2 provides that "public highways laid out in this state shall be sixty feet in width," the Road can only be of that same width.

{60}     The State misreads the statute as it has been interpreted previously by our Court of Appeals. In *Quintana v. Knowles*, 115 N.M. 360, 363, 851 P.2d 482, 485 (Ct. App. 1993), the Court of Appeals held that a road established by public use is not "laid out" within the meaning of Section 67-5-2. In *State ex rel. Baxter v. Egolf*, 107 N.M. 315, 319, 757 P.2d 371, 375 (Ct. App. 1988), the Court of Appeals held that a highway established by prescription was not "laid out" within the meaning of Section 67-5-2.

{61}     The *Baxter* Court held that Old Bishop's Lodge Road in Santa Fe, while formally established as a state highway in 1919, was established as a public roadway much earlier,

16

by prescriptive use. 107 N.M. at 318, 757 P.2d at 374. When the road became a state highway, no width was specifically stated. *Id.* at 319, 757 P.2d at 375. While not taking a specific position on what the term "laid out" meant, the *Baxter* Court nonetheless concluded that the statutory width did not apply to a road established "by use, not by statutory authority." *Id.*

**{62}** Similarly here, the Road was a public thoroughfare long before it was officially established as a state road. The State acknowledges that the Road existed, as part of the Santa Fe Trail, even before New Mexico became a state. The State fails to show that when the Road was officially established as a state highway, state officials gave it any particular width. Evidence in the record supports the district court's conclusion that the Road is 24 feet wide. Like the road in *Baxter*, the Road is not subject to the width requirement of Section 67-5-2.

## CONCLUSION

**{63}** We affirm that portion of the Court of Appeals memorandum opinion which affirmed a width in the Road of 24 feet. We reverse the remainder of the memorandum opinion. In the absence of any future litigation demonstrating otherwise, the boundary between the Ranch and state trust lands remains where it has long been assumed to be situated. The Road provides public access to state trust lands by way of the Heck Canyon Trail, and the Ranch may not blockade public access along the Road or the Heck Canyon Trail to those state trust lands, unless and until the Ranch judicially establishes in a new and separate proceeding that its boundary with the State is differently situated.

**{64}** **IT IS SO ORDERED.**

**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

**EDWARD L. CHÁVEZ, Chief Justice**

**PATRICIO M. SERNA, Justice**

**PETRA JIMENEZ MAES, Justice**

17

**CHARLES W. DANIELS, Justice**

**Topic Index for** *State ex. rel King v. UU Bar Ranch, Ltd.,* **No. 30,722**

**AE:**           **Appeal and Error**
AE-LC:         Law of the Case

**CP:**           **Civil Procedure**
CP-ID:         Indispensable Parties

**GV:**           **Government**
GV-PL:         Public Lands